### BOONE HUNTER v. THE STATE.

No. 3893.        Decided June 17, 1908.

**1.—Murder—Evidence—Res gestae—Competency of Witness.**

Upon trial for murder there was no error in admitting the testimony of a State's witness who testified that she was close to the scene of the homicide and heard the shooting in which her father and brother were killed; that she ran up to the wagon, found her father lying in the wagon unconscious, and her brother who was ten years of age (and who had since died) standing in the wagon, and who replied to her question as to who did the shooting, that it was the defendant and his father; this was res gestae; the question as to the competency of the dead witness was immaterial. Following Croomes v. State, 40 Texas Crim. Rep., 672.

**2.—Same—Evidence—Threats—Animus.**

Upon trial for murder there was no error in admitting the declaration of a codefendant made five or six days before the homicide in which he abused and threatened the deceased; it having been shown that the defendant and his codefendant subsequently cooperated in the homicide.

**3.—Same—Evidence—Expert Testimony.**

Upon trial for murder there was no error to permit a State's witness, who had qualified himself as a judge of the difference between the report of a winchester rifle and a shotgun, to give his opinion as to what character of gun was used during the homicide from the sound of the shot which the witness heard while some distance away from the scene of the homicide.

**4.—Same—Evidence—Character of Deceased.**

Upon trial for murder there was no error in rejecting testimony by the defense based upon a hypothetical case, instead of offering testimony as to the general character of the deceased.

**5.—Same—Bill of Exceptions.**

Upon appeal from a conviction of murder in the second degree a bill of exceptions not approved by the trial judge, could not be considered.

**6.—Same—Dying Declarations—Evidence.**

Upon trial for murder there was no error to admit the dying declaration of the deceased who was about ten years of age at the time he made it; the evidence showing a sufficient intelligence of the deceased, and that he was conscious of impending death at the time; although his death did not take place until some time after said declaration, and after a surgical operation had been performed on the deceased.

**7.—Same—Charge of Court—Impeaching Testimony.**

Where upon trial for murder the court had sufficiently charged upon the question of impeaching testimony, there was no error in refusing a requested charge on the same subject.

Appeal from the District Court of Gonzales. Tried below before the Hon. M. Kennon.

Appeal from a conviction for murder in the second degree; penalty five years imprisonment in the penitentiary.

The opinion states the case.

*C. K. Walter* and *J. W. Rainbolt,* for appellant.—Upon question of admitting testimony with reference to declarations of codefendant: Leslie v. State, 42 Texas Crim. Rep., 165; 57 S. W. Rep., 659; Red v. State, 47 S. W. Rep., 1003. On question of dying declarations: Edmondson v. State, 7 Texas Crim. App., 116; 41 Texas Rep., 230; Krebs v. State, 3 Texas Crim. App., 48; Hunnicutt v. State, 18 Texas Crim. App., 498; Benavides v. State, 31 Texas, 79. On question of admitting dying declaration of a child: Brown v. State, 2 Texas Crim. App., 115; Lawson v. State, 50 S. W. Rep., 345; 4 Am. & Eng. Enc. Ev., art. 7, sec. 1, p. 933; Worthington v. State, 56 L. R. A. 360.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at five years confinement in the penitentiary.

Ollie Van Dorn, the deceased, and his father were in a wagon.

Appellant and his father, Tom Hunter, met the Van Dorns in the road, and a difficulty arose in which the Hunters killed deceased and his father.

Bill of exceptions No. 1 shows that Lorena Van Dorn was permitted to testify that she was picking cotton in her father's field on the evening of the difficulty and heard the shots. That she was about one hundred yards from the scene of the difficulty, and that when she heard the shots she immediately ran to the scene, and saw Tom Hunter and defendant with guns in their hands running towards the house. That her father was lying in the wagon unconscious and that her brother Ollie Van Dorn was standing in the wagon, and that she did not know at this time that he had been shot, and that she asked Ollie who did that and he replied: "Tom and Boone Hunter did it; they rose up from behind the gate as we were coming down the road and killed papa." That at that time her brother was ten years of age, had never been in court; had never been to school, but had been going to Sunday school since he was three years of age, and that he was a boy of average intelligence for that age, and that he was now dead. This testimony was, in the first place, res gestae, and the question as to the competency of the witness is immaterial as held by this court in the case of Croomes v. State, 40 Texas Crim. Rep., 672.

Bill of exceptions No. 2 shows that George Mills, over objection of appellant, stated that about five or six days before the fatal difficulty in which D. M. Van Dorn and Ollie Van Dorn lost their lives, that he was at the home of Tom Hunter, codefendant of this defendant, and that Tom Hunter asked him where Van Dorn carried his cotton to gin, and that he told him to Greer's gin; and that Tom Hunter then told him to tell "'Old Cud' and 'Kinky' that the dogs had fucked their mammies, and that they would do the same thing if they had the chance, and that any one who was a friend to them was a son-of-a-bitch and for him to tell 'Old Cud,' Van Dorn that he said that." Appellant objected to the testimony on the ground that same was not a threat, and was immaterial and irrelevant, and was highly prejudicial to the defendant, and was not admissible upon any theory of the case. This testimony showed animus on the part of appellant's codefendant; appellant having subsequently cooperated with him in the wanton killing, the same was admissible to show inferential malice on the part of appellant towards deceased. The testimony shows clearly it alluded to and had reference to the deceased.

Bill of exceptions No. 3 shows that George Mills testified that he resided about one mile from the home of the defendant and from the place where the difficulty had occurred which resulted in the death of the deceased, and that he was at home on the day on which it occurred and that he heard a number of shots in the direction

of the place where the difficulty occurred, and that from the sound of firing there were three different characters of reports, some being louder than the other, and that the first two shots were not as loud as the loudest, but sounded louder than the report of the third gun. That he had heard guns fire and could tell the difference between the report of a winchester and a shotgun. The witness was then asked by the prosecution what in his opinion, judging from the sound of the different reports, was the kind of gun that fired the first two shots, and what kind of a gun was used in firing of the other shots. Appellant objected on the ground that witness had not qualified as an expert in the sounds of different characters of firearms, and, that the answer sought to be elicited would be but an opinion and conclusion of the witness, and that this question was one for the jury to determine from all the circumstances and testimony in the case. Thereupon the court overruled the objection, and the witness testified: "The first two shots sounded like the report of a shotgun and the other shot following sounded like rifle shots made from a large rifle, and a smaller one mixed with shotgun report." The witness had testified that he had heard guns fire and could tell the difference between the report of a winchester and a shotgun. This testimony was admissible.

Bill of exceptions No. 4 shows appellant placed A. A. Talley upon the stand and propounded to him the following question: "From your knowledge of the reputation of the deceased, D. M. Van Dorn, was he a man who would likely resent in a violent manner upon the person of the sender of a message purporting to have been sent to him by Tom Hunter to the effect that the dogs had fucked his mammy; that he would do the same thing if he had a chance, and that anybody who was a friend to him was a son-of-a-bitch, if such message had been actually delivered to him by a third party as coming from the said Tom Hunter." The object and purpose of said question being to corroborate the witnesses for the defendant that deceased D. M. Van Dorn fired the first shots which precipitated the difficulty, and ended in the death of said D. M. Van Dorn and his son, Ollie Van Dorn, the defendant being charged with the murder of the latter, and the latter's death being by the defendant claimed to be accidental and received while the defendant and the father were defending themselves against an attack upon them by D. M. Van Dorn. The prosecution objected to the question on the ground that same was immaterial and irrelevant, and not the statutory mode of showing the character of the deceased, and it was not permissible to show it in any other manner. The court sustained the objection. The witness would have testified, if permitted, that he was a man who would likely resent in a violent manner upon the person of the sender of such a message the first time he saw him. Appellant offered to prove the same fact by other witnesses. This testimony

was not admissible. It is always permissible to prove the general character of the deceased, but to put hypothetical cases like the one above prepounded is not authorized by the rules of this court.

Bill of exceptions No. 5 relates to the testimony of Earl Van Dorn, which proves the dying declarations of his brother, Ollie Van Dorn, but we notice the bill is not approved by the judge, and, therefore, can not be considered.

Bill of exceptions No. 6, however, relates to the same matter mentioned in Bill No. 5. Earl Van Dorn having testified to the dying declarations, appellant moved the court to exclude and strike from the record the testimony of the witness, Earl Van Dorn, which testimony was as follows: That he was a brother of the deceased, and that he saw deceased at the house of his father about four hours after the difficulty and between eight and nine o'clock of the same evening; that the mind of the deceased was clear; that he was about ten years of age, had never been to school, but had been to Sunday school; that the deceased had never known of a death previous to this; that he never expressed any hope that he would get well, but all along stated that he thought he would never get well, but that he did not say when he thought he was going to die; that he, witness, told him all along that he thought he would get well; that the doctors did not tell him he was going to die; that about thirty-six hours after the statement was made, the doctors operated on him, by amputating his leg at the thigh; that he never fully recovered from the operation and died about five hours after the completion of the operation; that he informed deceased, that the doctors desired to operate on him, and that he, witness, told deceased he thought he would get well if he was operated upon, and that deceased consented to the operation; that he, witness, did not think he was going to die at the time the statement was made; that he was in the room alone with deceased when the statement was made and no one else was present, although there were a number of people and two doctors at the house at the time and in and out of the room at intervals; and that Ollie Van Dorn then stated to him without having been asked any questions, that he desired to make a statement to him about the difficulty; that he knew that he was going to die, and that then he made the following statement: "Papa and I were coming down the road on our way home from the gin, and I saw Tom Hunter and Boone Hunter and said, 'Papa, there are Tom and Boone Hunter, and they are going to kill you,' and papa said, 'No, they are not,' and we drove on, and when we got closer to the gate, Tom Hunter said to papa, 'Stick up your damn head, I want to shoot it off,' and the Hunters began firing on us; then papa shot, then they shot; then papa shot; then they shot; then the Hunters shot again; papa fell back in the wagon, and then Tom Hunter said to Boone Hunter, 'Don't let the little

son-of-a-bitch get away, shoot him,' and that then Boone Hunter came out in the road and shot at me twice and missed me, and then came to the back of the wagon, stuck his gun through the back and between the end boards and shot me." Appellant asked that this testimony be excluded for the following reasons: That it was not shown that the deceased would have been a competent witness if alive at that time; and that it was not shown at the time such statement was made that deceased was in danger of approaching or immediate death, or that he was conscious of such approaching death as is contemplated by the statutes when such statements may be made; that is, first, that the death of the declarant was imminent; second, that he was so fully aware of this as to be without any hope of life, and, third, that he was not sufficiently clear in his mind. The other testimony in the record by the witness for the State, Dr. Dawe, being as follows: "I attended the deceased a few hours after the difficulty; arrived there about six or seven o'clock and did not leave till ten or eleven o'clock; his mind was clear. Dr. Davie and I placed the injured limb in a plaster and decided to wait till next day to make thorough examination. He was suffering from a wound in the right thigh and slight wound in the left thigh, but could not tell the extent of the injury at that time. We examined him next day and concluded his thigh bone was fractured and that an amputation was necessary. We amputated his right leg at the thigh and he died about five hours after the operation. I did not tell the boy he was going to die, but told him I thought he would get well and he consented to the operation." We think this testimony was admissible. Under the authorities of this court it is not necessary, in order to make a dying declaration admissible, that deceased should indicate he is going to die in an hour or a few hours, but the authorities hold that he must be conscious of impending death. The circumstances in this case show clearly that the boy was conscious of impending death. The character of his wounds and all the surroundings indicate that he had just basis for believing this, since the doctor testified that only about fifty per cent of those who have the leg taken off at the hip ever get well. There is nothing in the above recited bill to show a lack of intelligence, but it shows a clear logical and succinct statement for a boy of ten years of age. The fact that the boy was only ten years of age would not preclude the testimony. Where the facts, as they do here, show clearly that degree of intelligence that this bill manifests, the testimony of a child is admissible. We accordingly hold that the court did not err in refusing to exclude the testimony.

Bill of exceptions No. 7 shows while State's counsel was addressing the jury, the following statement was made: "Every witness in the case that has been put upon the stand by the defendant has helped

the State's case; the proof of Mrs. Hunter, witness for the defendant in this case, being that her children were not picking cotton at the time of the difficulty and that none but the participants saw the beginning of the difficulty." Thereupon the defendant requested the court to give in charge to the jury the following charge: "You are charged that you will not consider any testimony in this case tending to show that Mrs. Hunter had told others that none but the participants saw the beginning of the difficulty, as proof of such fact, as such testimony was admitted only for the purpose of impeachment." This charge the court declined to give; but the court did give the following charge in reference to impeaching testimony: "Witnesses may be impeached by showing that they have made other and different statements out of court from those made before you on the trial. You may consider such impeaching evidence as it may tend to affect the weight to be given the testimony of the witnesses so impeached, and their credibility; but such impeaching evidence is not to be considered by you as tending to establish the alleged guilt of the defendant or any fact in the case." This general charge on impeaching testimony sufficiently covered appellant's complaint.

Bills of exceptions Nos. 8 and 9 relate to similar impeaching matter, which impeaching testimony, as stated, was covered by the main charge.

The charge of the court is a very proper and accurate presentation of all the law applicable to the facts of this case, and the evidence amply supports the verdict, and the judgment is in all things affirmed.

*Affirmed.*

[Motion for rehearing overruled December 10, 1908.—Reporter.]